**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONALD G. SCHLEY,
Plaintiff-Appellant,

v.

No. 95-1932

COLLEGE OF CHARLESTON; MARTIN
PERLMUTTER,
Defendants-Appellees.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
William M. Catoe, Jr., Magistrate Judge.
(CA-92-3350-2-22AK)

Argued: December 6, 1995

Decided: April 23, 1996

Before WIDENER and NIEMEYER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Douglas A. Churdar, HUNTER & CHURDAR, P.A.,
Greenville, South Carolina, for Appellant. Katherine Dudley Helms,
HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, P.A.,
Columbia, South Carolina, for Appellees. **ON BRIEF:** Terry E.
Haskins, Greenville, South Carolina, for Appellant. Charles T.
Speth, II, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES,
P.A., Columbia, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Alleging that he was not hired for three tenure-track positions because of his religious beliefs, Donald Schley brought suit against the College of Charleston and Dr. Martin Perlmutter in his official capacity under 42 U.S.C. § 1983 and 42 U.S.C.§ 2000e et seq. (Title VII). The district court dismissed the § 1983 claims prior to trial. After a bench trial on the Title VII claims, the magistrate judge entered judgment for the defendants. On appeal, Dr. Schley contends that the district court erred by denying his motion to amend his complaint and by striking his motion for a jury trial. He also asserts that the magistrate judge applied an erroneous legal standard when assessing his Title VII claims. We affirm.

I

Dr. Donald Schley received his Ph.D. in Old Testament from Emory University in 1987 and passed doctoral exams at the University of Gottingen in Germany. He had previously received his undergraduate degree from Eckerd College and his masters degree from the Candler School of Theology at Emory.

In 1988, Dr. Schley applied for a position as a tenure-track religious studies professor at the College of Charleston in Charleston, South Carolina. Later that same year, Dr. Schley attended the annual conference sponsored by the American Academy of Religion/Society for Biblical Literature seeking a permanent position in his field. At the Conference he met a friend, Dr. June McDaniel, who was an associate professor at the College. Dr. Schley gave her a copy of his curriculum vitae, which Dr. McDaniel then showed to Dr. Martin Perlmutter, the chairman of the Department of Philosophy and Religious Studies at the College. Dr. Perlmutter glanced at the vitae and returned it to Dr. McDaniel.

2

Following a search for faculty in 1988-89, the College hired Dr. Joseph Hoffman. Dr. Schley admitted at trial that he was less qualified than Dr. Hoffman. After Dr. Hoffman withdrew his acceptance, the College decided to wait a year to conduct another search for a tenure-track professor. In the meantime, to fill the continuing need for an instructor, the College created a one-year, visiting assistant professorship. This new position was not on the tenure track.

Dr. McDaniel resubmitted Dr. Schley's name, along with his newly revised vitae, to the hiring committee. At the suggestion of Dr. McDaniel, who had also told him not to reveal his political and religious views, Dr. Schley had removed the information in his vitae that did not relate to his professional experience or qualifications. This included information about his personal history and his experience teaching Sunday school. Dr. McDaniel and several other witnesses for the College testified that including personal information of this type in a vitae showed a lack of professionalism. Dr. McDaniel also testified that she advised Dr. Schley not to discuss his political and religious views only because he had a tendency to get into heated arguments on these subjects.

Dr. Schley testified that during his final interview for the short-term position, Dr. Perlmutter told him that his initial vitae prevented the College from ever considering him for a tenure-track position. During cross-examination he admitted that Dr. Perlmutter merely told him that he would never teach at the College permanently. Dr. Perlmutter testified that he commonly informed visiting faculty that they were not automatically on track for tenure. He also testified that he had not referred to Dr. Schley's original vitae during the interview. The College offered Dr. Schley the one-year position, and Dr. Schley subsequently earned a reputation as a competent and well-liked teacher.

In the fall of 1989, the College once again began its search for a tenure-track professor. In an advertisement for the position, the College specified that it was seeking Ph.D. applicants with a demonstrated excellence in teaching and a specialization in Biblical Studies. The College considered over 100 applicants, including Dr. Schley, who submitted his revised vitae for consideration. Dr. Schley's candidacy was initially supported by several members of the Department.

3

However, at the conclusion of the 1989-90 search, the College hired David Frankfurter after a majority of the faculty on the hiring committee determined that he had superior credentials.

Frankfurter had completed his doctoral courses in Religions of Late Antiquity at Princeton University and was in the process of finishing his dissertation. At trial, the College introduced evidence showing that it was its policy to consider an applicant who had completed all requirements for a doctorate except a dissertation. Dr. Perlmutter and the other members of the hiring committee also testified that they considered the prestige of the undergraduate and graduate institutions Frankfurter attended, the excellence of his recommendations, and his academic promise, as evidenced by the depth of his scholarly interest and upcoming publications. In addition, he was publishing at an acceptable rate and was qualified to teach courses in Biblical Studies.

A number of the faculty members who participated in the hiring process testified that although Dr. Schley was a qualified candidate, his application was not as strong as that submitted by Frankfurter. Specifically, these individuals pointed to Dr. Schley's comparatively weak recommendations, his lack of relevant experience, and a belief that Dr. Schley was not as academically promising as Frankfurter.

After Dr. Schley fulfilled his contract, the College offered him a second one-year position as a visiting professor. In 1990, during his second year, the College advertised for an opening for a tenure-track assistant professor who could teach a variety of religious studies courses. The College specified that although the area of specialization was open, it was seeking to expand and was not interested in additional New Testament scholars. Although Dr. Schley applied for the position, several faculty members testified that they believed that Dr. Schley was not qualified because of his narrow focus on Biblical Studies. There was additional evidence that the individual who was eventually hired, Dr. Lee Irwin, was qualified to teach in several of the fields into which the College was expanding, including Islamic and Native American religious studies.

Dr. Schley introduced the testimony of a former faculty member and a student who alleged generally that the faculty was biased against committed Christians. This testimony was rebutted by other

4

members of the faculty. Dr. Schley also testified that he was told by both Dr. McDaniel and Dr. Perlmutter that he belonged in a church-related school. Both Dr. McDaniel and Dr. Perlmutter testified that they had given Dr. Schley advice on ways to improve his vitae, telling him that only church-related schools would view all the information in his initial vitae as relevant. Another former student testified that he was told by Dr. Perlmutter that "someone with a strong religious conviction like Dr. Schley would not be appropriate to teach a New Testament class." At trial, Dr. Perlmutter denied making such a statement. In addition, as a visiting professor, Dr. Schley taught two New Testament classes.

A number of professors on the hiring committee, including Dr. Perlmutter, were aware of Dr. Schley's religious beliefs and testified that those beliefs were never a consideration. They pointed to Dr. Irwin's vitae which listed his experience as a ministry associate for an ecumenical campus ministry. Other faculty members testified that they were not aware of Dr. Schley's beliefs during the relevant periods.

Dr. Schley brought suit under § 1983 and Title VII against the College and Dr. Perlmutter in his official capacity, seeking actual and punitive damages and "such other and further relief" as the court deemed proper. He alleged that he had been discriminated against during the College's searches for a tenure-track professor because of his religious beliefs. The district court dismissed the § 1983 claims and found that Dr. Schley was not entitled to a jury trial on the remaining Title VII claims. The district court also denied injunctive relief. After a bench trial, a magistrate judge entered judgment for the defendants.

II

Dr. Schley contends that the district court erred by dismissing his § 1983 claims, which were based on the First Amendment. He also contends that he was entitled to a jury trial on his First Amendment claims and to injunctive relief.

Applying the Eleventh Amendment, the court properly dismissed the claims for actual and punitive damages brought against the College and Dr. Perlmutter in his official capacity, because, under South

5

Carolina law, any judgment entered against them would have been paid out of the state treasury. See Ford Motor Co. v. Department of the Treasury, 323 U.S. 459, 462-63 (1945). Also, neither states nor state officials acting in their official capacities are persons within the meaning of § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). Because as a matter of law Dr. Schley could not recover actual and punitive damages, he was not entitled to a jury trial on those claims.

Dr. Schley argues that his prayer for general relief entitled him to prospective injunctive relief that precluded dismissal of his action against Dr. Perlmutter in his official capacity. He argues in the alternative that the district court erred by denying his motion to amend his complaint to add a prayer for injunctive relief against Dr. Pennhurst in his official capacity.

The district court's denial of Dr. Schley's motion to amend to seek injunctive relief need not detain us. His prayer for "general relief" entitled him to all the relief justified by the evidence. Fed. R. Civ. P. 54(c). The Eleventh Amendment does not prohibit all suits for prospective injunctive relief brought against state officials in their official capacities. Edelman v. Jordan, 415 U.S. 651, 664-67 (1974). We conclude, however, that it was within the court's discretion not to create an injunctive remedy against Dr. Perlmutter in his official capacity. The district court denied the injunction, noting that Dr. Schley had not taught at the College for three years and had a position in another college. It held that he lacked standing to represent taxpayers and future applicants. However, we need not rest our affirmance of the district court's denial of injunctive relief on these grounds. After the trial on Dr. Schley's Title VII claims, it became clear that the College did not discriminate on religious grounds, and no injunction was warranted. Since a request for injunctive relief is equitable in nature, Dr. Schley was not entitled to a jury.

III

By consent, the magistrate judge conducted the trial on the Title VII issues. See 28 U.S.C. § 636(c). The Title VII claims, which were based on events before the enactment of the Civil Rights Act of 1991,

6

did not entitle Dr. Schley to a jury. See Landsgraf v. U.S.I. Film Products, 114 S. Ct. 1483 (1994).

The evidence discloses that from hundreds of applicants, the selection committees, acting without bias against any candidate on account of religion, chose the most qualified applicants. The witnesses testified why they believed the successful candidates' credentials were superior to those of Dr. Schley. Their testimony showed no taint of discrimination, and the magistrate judge's acceptance of their explanations is amply supported by the evidence. Several persons who were not on the selection committees attributed religiously prejudicial remarks to Dr. Perlmutter, who denied them. Upholding Dr. Perlmutter and other faculty members who were accused of bias, the magistrate judge made credibility findings that are justified by the record.

The magistrate judge first analyzed the case according to the formula of McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). He found that Dr. Schley presented a prima facie case and consequently considered the defendants' evidence. At this stage of the proceedings, the presumptions raised by the prima facie case dropped from the case, and the factual inquiry became whether the defendants discriminated against Dr. Schley because of his religion. United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 713-16 (1983). The magistrate judge's conclusion that the evidence did not disclose discrimination is supported by substantial evidence.

In response to Dr. Schley's Rule 59 motion, the magistrate judge again properly denied a jury trial on both the § 1983 claims and the Title VII claims. Dr. Schley's argument that this is a mixed-motive case lacks merit. Even if it were such a case, the defendants proved by a preponderance of the evidence that religious discrimination played no part in the College's hiring decisions. The magistrate judge also reviewed the First Amendment claims and found that the evidence established that the defendants did not deprive Dr. Schley of his rights under this amendment.

7

In sum, we detect neither reversible error in procedure nor failure in the College's proof.

<u>AFFIRMED</u>

8